Brian J. Foster, #012143
**FOSTER LAW PARTNERS**
4402 N. 36th Street, Suite 127
Phoenix, AZ 85018
Tel:   (602) 509-7345
E-mail: brian@fosterlawpartners.com

*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| ROBERT COLE STEMKOWSKI GOLDMAN,<br><br>                    Plaintiff,<br><br>          v.<br><br>THE ARIZONA BOARD OF REGENTS; UNIVERSITY OF ARIZONA, a non-profit institution; UNIVERSITY OF ARIZONA COLLEGE OF NURSING, a non-profit institution;  DEPARTMENT OF ADMINISTRATION STATE OF ARIZONA; HYOCHOL BRIAN AHN AND JANE DOE AHN; GAIL D. BURD AND JOHN DOE BURD; DR. BETTY PARISEK and JOHN DOE PARISEK; CHRISSY LIEBERMAN AND JOHN DOE LIEBERMAN; DR. RONALD W. MARX and JANE DOE MARX, PEGGY ANN JENKINS AND JOHN DOE JENKINS; JOHN ARNOLD AND JANE DOE ARNOLD; TRACI VEZZOSI AND JOHN DOE VEZZOSI; THERESA RUZOVICH AND JOHN DOE RUZOVICH; JOHN AND JANE DOES I-IX; ABC CORPORATIONS 1-10; LIMITED LIABILITY COMPANIES AND/OR PARTNERSHIPS 1-10,<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**(Violation of Title II of the Americans with Disabilities Act, Violation of Section 504 of the Rehabilitation Act of 1973, Unlawful Retaliation in Violation of the ADA and Rehabilitation Act, Hostile Educational Environment in Violation of ADA Title II and Section 504, Denial of Procedural Due Process - Fourteenth Amendment, Violation of Substantive Due Process - Fourteenth Amendment, Violation of Equal Protection - Disability Discrimination - Fourteenth Amendment, First Amendment Retaliation, Violation of Right to Petition for Redress of Grievances - First Amendment, Fourteenth Amendment "Stigma-Plus" Claim, Breach of Contract, Breach of Implied Covenant and Fair Dealing, Negligent Misrepresentation, Intentional Infliction of Emotional Distress, Defamation)**<br><br>**(TIER 3 CASE)** |

Plaintiff Robert Cole Goldman Stemkowski ("Plaintiff" or "Goldman") files his Complaint against all Defendants as follows:

**PARTIES**

1.     Plaintiff Robert Cole Goldman Stemkowski is a resident of Maricopa, Arizona.

2.     Defendant Arizona Board of Regents ("Defendant AZ BOR") is the governing board of the University of Arizona. Defendant AZ BOR caused the events which are the subject of this Complaint.

3.     Defendant University of Arizona ("Defendant U of A") is an Arizona non-profit institution. Defendant U of A caused the events which are the subject of this Complaint.

4.     Defendant University of Arizona College of Nursing ("Defendant CON") is a non-profit institution which operates in Gilbert, AZ. Defendant CON caused the events which are the subject of this Complaint.

5.     Defendant State of Arizona Department of Administration ("Defendant DOA") is a governmental agency.  Defendant DOA caused the events which are the subject of the Complaint.

6.     Defendants Hyochol Brian Ahn and Jane Doe Ahn are husband and wife. Mr. Ahn was at all relevant times the Dean and/or a Professor at the CON at all times acted and for and on behalf of his marital community.

7.      Defendants Betty Parisek and John Doe Parisek are husband and wife.  Ms. Parisek was at all relevant times an Associate Clinical Professor, Interim Division Chair in Nursing and Health Education. She at all times acted for and on behalf of her marital community.

8.      Defendants Gail D. Burd and John Doe Burd are wife and husband.  Ms. Burd was at all relevant times the Senior Vice Provost, Office of Academic Affairs – Teaching and Learning. She at all times acted for and on behalf of her marital community.

9.      Defendants Chrissy Lieberman and John Doe Lieberman are husband and wife.  Ms. Lieberman was at all relevant times either the Associate Dean of Students or Interim Dean of Students. She at all times acted for and on behalf of her marital community.

10.     Defendants Ronald W. Marx and Jane Doe Marx are husband and wife.  Mr. Marx was at all relevant times the Interim Senior Vice President for Academic Affairs and Provost. He at all times acted for and on behalf of his marital community.

11.     Defendants Peggy Ann Jenkins and John Doe Jenkins are husband and wife.  Ms. Jenkins was at all relevant times the Associate Dean of Academic Affairs and Clinical Professor. She at all times acted for and on behalf of her marital community.

12.     Defendants John Arnold and Jane Doe Arnold are husband and wife.  Mr. Arnold was at all relevant times the  Senior Vice President for Business Affairs and Chief Operating Officer and CFO at the Arizona BOR. He at all times acted for and on behalf of his marital community.

13.     Defendants Traci Vezzosi and John Doe Vezzosi are husband and wife.  Ms. Arnold was at all relevant times a Professor and Senior Lecturer at the CON. She at all times acted for and on behalf of her marital community.

14.     Defendants Theresa Ruzovich and John Doe Ruzovich are husband and wife.  Ms. Ruzovich was at all relevant times a Professor and lecturer during the course Chair NURS 370. She at all times acted for and on behalf of her marital community.

15.     Defendants John Does and Jane Does 1-10, ABC Corporations 1-10, Limited Liability Companies and/or Partnership 1-10 are persons and entities whose true identities are unknown to Plaintiff, who together with named Defendants contributed to causing Plaintiff's damages.  Plaintiff will amend his Complaint when the true names of those Defendants become unknown.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, including the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Unlawful Retaliation under the ADA and other federal statutes.

17.     The Court also has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and

§1391(b)(2) because all Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District.

19.    Plaintiff attended Defendant CON courses in Gilbert, AZ.

20.    All of the individual Defendants, at all relevant times, acted within the course and scope of their employment and agency relationships with the Defendants.

## FACTUAL BACKGROUND

21.    Plaintiff at all times was diagnosed with Dyslexia, Dysgraphia, ADHD, and Autism Spectrum Disorder. Plaintiff also has bladder issues due to a previous surgery requiring accommodations for restroom breaks.

22.    Throughout his academic career, Plaintiff has successfully completed the same rigorous coursework as his peers, requiring only appropriate accommodations to access the curriculum.

23.    Plaintiff's acceptance into the University of Arizona's competitive nursing program and strong performance when properly accommodated demonstrate his academic capabilities and determination.

24.    Throughout high school, while fully participating in regular classes alongside his peers, Plaintiff received appropriate accommodations under an Individualized Education Program ("IEP") that enabled him to complete the same challenging work as other students.

25.     On September 27, 2019, Plaintiff enrolled at the University of Arizona and proactively established accommodations through the Disability Resource Center ("DRC") to ensure continued academic success.

26.     On May 4, 2022, Plaintiff initiated contact with Defendant CON to inquire about their nursing curriculum. During this interaction, Plaintiff openly discussed his specific concerns and made known his affiliation with the DRC, along with his associated accommodations.

27.     Ms. Anna Boldt, Plaintiff's appointed DRC counselor, acted as Plaintiff's liaison with the Nursing Program to verify its awareness of Plaintiff's 504 accommodations and to secure its commitment to implementation.

28.     The confirmation and setup of Plaintiff's accommodations were finalized prior to the nursing program application process, reinforcing the institution's ostensible commitment to providing an inclusive learning environment.

29.     On August 29, 2022, Plaintiff took the HESI admission exam with accommodations through ProctorU, achieving an impressive score of 85.50%, demonstrating Plaintiff's aptitude for nursing studies when properly accommodated.

30.     For the nursing program interview, Plaintiff initiated communication with Amanda Lopez, the school's Admissions and Onboarding Advisor, to discuss Plaintiff's disabilities and formally request accommodations.

31.     Plaintiff requested extended time, speech-to-text support, closed captioning, advanced access to interview questions, and provisions for equivalent interview questions.

32.    Despite prior awareness of his accommodation needs and his proactive communication, Ms. Lopez denied Plaintiff's request due to "time constraints" that had never been previously communicated.

33.    Plaintiff was denied closed captioning and speech-to-text accommodations that were essential for his participation.

34.    The interview consisted of 10 questions with severely limited time allocations: 2 minutes for brainstorming each question, 1 minute to respond to each question, and 10 minutes for a 500-1000 word essay.

35.    For a student with dyslexia and dysgraphia, these time constraints without accommodations created an insurmountable barrier.

36.    On October 28, 2022, Plaintiff inquired about his application status for the Spring 2023 term. On November 2, 2022, Plaintiff was notified of his denial despite meeting GPA and HESI score requirements.

37.    After receiving the denial, Plaintiff requested a reevaluation, emailing both Dr. Goldsmith at the Tucson Campus and Dr. Parisek at the Gilbert campus.

38.    Plaintiff explained that his interview performance did not reflect his true abilities due to the lack of accommodations.

39.    Plaintiff also expressed concern regarding the potential loss of financial grants, vocational rehabilitation support, and U of A scholarships if denied admission.

40.    Despite his appeal, the School did not provide a clear explanation for the denial, simply attributing it to his grade/GPA level and HESI score, despite these factors falling within the acceptable range for program acceptance.

41.    On October 1, 2022, applications opened for the Summer nursing program. After learning of his Spring denial, Plaintiff applied for the Summer 2023 program, again seeking disability-based accommodations for the interview process.

42.    Despite the nursing program's awareness of his accommodation history and previous appeals, Ms. Lopez again refused accommodations, citing technical limitations of their web browser.

43.    Ms. Lopez claimed these limitations prevented extending time for questions and disabled the dictation feature for writing portions.

44.    Left with no choice and without accommodations, Plaintiff completed the nursing program interview on November 30, 2022.

45.    On February 15, 2023, Plaintiff received acceptance into the Gilbert campus nursing program. The initial orientation day for the Bachelor of Science in Nursing program at the Gilbert campus was Monday, May 15, 2023.

46.    On May 28, 2023, in an effort to be transparent and ensure proper accommodation implementation, Plaintiff sent an email to all his professors detailing his approved accommodations.

47.    Ms. Robb from the DRC also personally communicated with each of Plaintiff's teachers to ensure their understanding of his accommodation needs.

48.    The Plaintiff's Comprehensive Accommodation Plan ("CAP") encompassed alternate format reading materials (including E-Text for both print and online resources), note-taking support, permission to audio record lectures, and the use of a laptop or device for note-taking.

49.    The CAP further provided test accommodations—extending allotted time from 2.0x to 2.25x to account for necessary restroom breaks due to a documented bladder condition—along with calculator use, dictation software for composing exams, a minimal distraction testing environment supplemented by text-to-speech software and word processor access for exam responses.

50.    The CAP also included the provision of multiple blank 8x10 sheets for quizzes and exams, a consistent testing location, and dedicated restroom break accommodations, all designed to ensure equitable assessment conditions.

51.    Despite this early effort, Plaintiff faced a series of challenges where faculty failed to: communicate with other school staff to ensure technology was available; provide accommodations in accordance with his plan; unilaterally changed accommodations without engaging in any interactive process; and retaliated against him when he advocated for himself.

52.    During the NURS 371 Competency on June 1, 2023, and for the Simulation #1 with Group C on June 20, 2023, Plaintiff was forced to negotiate with the School to access his accommodations.

53.     Defendant CON insisted on stringent specificity, demanding explicit written permission for accommodations already clearly defined in Plaintiff's CAP.

54.     During competency day for the medication check, all students were allowed to use a standard drug reference book. To have equal access, Plaintiff sought to utilize his speech-to-text function on his iPad to access the same drug book in audiobook format, an approved accommodation listed in his CAP.

55.     Despite this reasonable request, the school displayed hesitancy.

56.     During simulations, Plaintiff requested to use the text-to-speech function on his iPad to transcribe notes or alternatively use the iPad to type notes. The school's resistance was particularly perplexing given that all other students were expected to handwrite their notes, while Plaintiff had a documented disability impacting his writing.

57.     These challenges stemmed from Defendant CON instructing the DRC to adhere to strict criteria. The DRC complied with the nursing school's directives without advocating for Plaintiff's existing accommodations and without engaging in any interactive process before changing accommodations in his 504 plan.

58.     Prior to Test 1, Plaintiff engaged in various tasks to ensure he would receive his disability-based accommodations, including educating faculty members, coordinating with NURS 370 faculty, setting up materials from FA Davis books, and arranging meetings with his DRC counselor.

59.     Test 1 (June 9, 2023): While using his approved text-to-speech accommodation, Plaintiff was interrupted by Defendant Director Betty Parisek who

entered the testing room and accused him of cheating. Defendant Parisek referenced the academic integrity policy, suggesting his use of his accommodation was akin to cheating.

60.     This accusation came despite the school having prior knowledge of Plaintiff's approved accommodations.

61.     The interaction with Defendant Parisek was prolonged and emotionally distressing. The dispute consumed considerable exam time, creating a disruptive impact on Plaintiff's concentration, focus, and denying him his full 2.25x extended testing time accommodation.

62.     Despite the unjust accusation and its impact on his academic performance, Plaintiff was not provided with the opportunity to retake the exam.

63.     In addition to the accusation, Plaintiff was denied other accommodations— he received only a small piece of scrap paper instead of the multiple full sheets specified in his plan, and was not provided with a calculator, losing valuable testing time while waiting for staff to locate one.

64.     On June 16, 2023, in NURS 371, Plaintiff faced additional harassment when Professor Durant, Defendant Parisek, and Mrs. Robb from the DRC office accused him of using Artificial Intelligence when completing a Self-Reflection Paper.

65.     Plaintiff had not used AI; he had used Grammarly, an accommodation approved by the school and provided through Vocational Rehabilitation that he had used for years.

66.    This unwarranted accusation significantly disrupted Plaintiff's study schedule, leading to multiple email exchanges over several days.

67.    Ironically, in August 2024, Defendant Dean Hyochol Brian Ahn would publicly praise AI's potential in nursing education, stating: "AI has the potential to revolutionize teaching, research and problem-solving by enhancing education, advancing research capabilities and improving patient care outcomes. Embracing AI responsibly and ethically can lead to significant advancements in nursing practice and health care as a whole."

68.    Test 2 (July 7, 2023): On Friday, June 30, 2023, Professor Ruzovich requested a change of testing site from Dr. Kelly's office at the Gilbert campus to the Chandler location, contradicting Plaintiff's approved accommodation for a consistent testing location.

69.    After Plaintiff identified this discrepancy and contacted Ms. Robb at the DRC, Professor Ruzovich communicated on July 4 that the exam would take place at the Gilbert site.

70.    On July 6, Defendant Professor Ruzovich informed Plaintiff by email that the exam on Friday, July 7, would start at 10 AM. However, on the morning of July 7 at 9 AM, Defendant Ruzovich sent an email stating he was supposed to be at the exam site at 9 AM.

71.    At 9:21 AM, Plaintiff received a voicemail from Defendant Parisek questioning his absence at the 9 AM start time.

72.   Plaintiff believes this confusing communication regarding testing time, which singled him out and was never explained, constituted retaliation for his advocacy against the unilateral change in testing location.

73.   This last-minute alteration caused panic and anxiety, diverting Plaintiff's focus from the exam content.

74.   During Test 2, Plaintiff was again denied proper accommodations, he received only a small piece of scrap paper instead of multiple full sheets, and was not provided with a calculator, again losing valuable testing time.

75.   The school's testing protocol required examinations to be uploaded within three hours of the start time. Although Plaintiff was directed to report at 10:00, the originally scheduled exam time was 9 AM to 12 PM, requiring upload by 12:00 PM.

76.   The instructors failed to adjust the submission deadline to reflect his later start time.

77.   Plaintiff completed and uploaded Exam 2 before 1 PM, adhering to the mandated 3-hour duration.

78.   Nevertheless, Defendants Ruzovich and Parisek accused him verbally and in writing of not submitting on time, suggesting Plaintiff might not receive any points.

79.   The school's IT technician ultimately determined that Plaintiff had submitted the exam on time and that the instructors had not adjusted the three-hour examination window to reflect the 10:00 AM start time they had communicated to him.

80.    Despite explaining the confusion to faculty before the exam, no extension to the upload deadline was considered.

81.    By the time technical staff confirmed Plaintiff's timely submission, the 48-hour window for exam question review had passed. This policy allows students to discuss exam questions with instructors and obtain additional points when discrepancies between questions and answers arise.

82.    Test 3 (July 28, 2023): Plaintiff's vital text-to-speech accommodation malfunctioned, and the highlighting tool provided to all other students did not work.

83.    When attempting to use text-to-speech, it would either not read the text or read out individual letters instead of words, with functionality decreasing further if highlighting was attempted.

84.    When Plaintiff reported these issues to Defendant Ruzovich, she falsely claimed she could not pause the exam or provide additional time.

85.    Instead, Defendant Ruzovich called in IT support during the exam, forcing Plaintiff to wait with the clock running on his timed examination and violating his accommodation for a quiet testing location without disruptions.

86.    Defendant Ruzovich refused to pause the examination or provide additional time, insisting Plaintiff complete it within the previously established time limit and without his accommodation.

87.    It was later discovered that she did have the ability to pause the exam and provide additional time but chose not to do so, effectively denying Plaintiff both his accommodation and the full testing time he was entitled to.

88.    Despite experiencing these technical difficulties that denied Plaintiff's accommodations, Plaintiff was never offered the opportunity for a test retake.

89.    Additionally, Plaintiff was again not provided originally with a calculator or the requested multiple sheets of scratch paper.

90.    ATI 370 Exam (July 31, 2023): On the evening of July 29, 2023, Plaintiff was advised he would not be allowed to use his text-to-speech accommodation for the July 31 exam, and instead, the exam would be read aloud by human readers.

91.    This had never been an accommodation Plaintiff used, and had he been asked, he would have explained it would not be helpful.

92.    When Plaintiff arrived at the testing location, he learned that the exam content would be presented on a large screen and read aloud by multiple professors who rotated in and out of the room throughout the exam.

93.    Rather than having a single reader, these rotating professors created constant disruptions and significantly impaired Plaintiff's ability to concentrate.

94.    The testing room had large windows with no coverings, with numerous people passing by creating frequent distractions. Plaintiff needs a quiet place with no distractions for testing, and this environment was anything but that.

95.    These conditions subjected Plaintiff to public humiliation and embarrassment.

96.    This unilateral change to Plaintiff's accommodation deprived Plaintiff of access to accommodations he needed, including the ability to go at his own pace, access to a highlighting function, and the ability to re-listen to questions multiple times throughout the exam.

97.    During this exam, Plaintiff was once again accused of cheating by Defendant Ruzovich, who claimed Plaintiff had used his phone to email the DRC after expressing dissatisfaction about not receiving his accommodations.

98.    Initial Final Exam (August 8, 2023): Plaintiff experienced continued technical issues with the text-to-speech feature, which often failed to recognize text or read out individual letters instead of words.

99.    Plaintiff had to continually scan passages multiple times to get them read. Additionally, Plaintiff was unable to use the highlighting function available to his non-disabled classmates.

100.    After Exam 3, Plaintiff had been directed to meet with the IT department. IT staff member Pablo provided information on resetting features in the program, which Plaintiff tried during the final exam without success.

101.    However, IT did not recommend in-person troubleshooting or offer a backup computer for the final exam.

102.    During the final exam, Plaintiff was provided with only a half sheet of scratch paper, continuing the pattern of accommodation denial.

103.    The exam was longer than previous assessments, with 75 questions worth 200 points, and Plaintiff felt extremely rushed.

104.    Most critically, evidence later revealed that Plaintiff received only 3 hours for the exam instead of the 254.25 minutes (4 hours and 14 minutes) required by his 2.25x time accommodation.

105.    In total, Plaintiff was shorted 1 hour and 14 minutes of time he should have been provided.

106.    The shortened time, combined with technical issues and limited scratch paper, forced Plaintiff to rush through math problems, an area where his disability requires additional processing time.

107.    The time pressure was exacerbated by his urgent need to use the restroom due to his bladder condition. Given the limited time, Plaintiff was unable to take a bathroom break and became incontinent during testing, creating significant physical discomfort that further detracted from his concentration.

108.    Plaintiff scored 67.5% on the final exam (rounded to 68.5%), falling 3.5% short of the 72% requirement needed to advance in the nursing program.

109.    Plaintiff's final score was 7 points away from reaching the 72% target, equivalent to approximately 3 questions.

110.    Had Plaintiff been provided his full accommodations, particularly the extended time accommodation, he would have had the time needed to fully answer the math problems in the "Drug Calculations/Medication Administration" section, which were worth sufficient points to reach the passing threshold.

111.    On the final exam, August 16, 2023, there were two to three questions marked wrong when Plaintiff challenged the content of these questions. Both Defendant Ruzovich and Diamond dismissed his concerns about multiple questions that were marked wrong but "should have been marked correct".

112.    Following the final exam, on August 16, 2023, Plaintiff met with Defendant Ruzovich and Professor Diamond to discuss the implications of failing.

113.    Distraught over the prospect of failing by such a small margin, Plaintiff asked if there were opportunities such as projects or oral exams to bridge the 3.5% gap needed for a passing grade.

114.    Their response was dismissive: "I don't know what to tell you." They informed Plaintiff that because of his cumulative examination scores (which were just 1% below the cutoff), he was dismissed from the nursing program effective immediately.

115.    They took no responsibility for the school's failures to provide accommodations and shifted the burden entirely to the Plaintiff.

116.    They then notified Plaintiff that if he wished to be reinstated, he would have to submit an essay by 8:00 AM the following day (within 14 hours) explaining why he

should be reinstated, an unreasonable deadline for a student with documented dyslexia and dysgraphia.

117.    Plaintiff subsequently applied for reinstatement and was eventually granted reentry into the program. However, because he was not given a passing grade for the Summer program, he was not allowed to matriculate with his peers.

118.    With the Fall semester starting in a few days, the Plaintiff was advised he could request a grade appeal.

119.    The first step in the grade appeal was a meeting with Defendant Ruzovich and Dr. Diamond, who presented three options: (1) accept the failing grade, (2) take a second final exam and accept the score, or (3) continue with the grade appeal process, which would not be completed by the time fall classes started, meaning Plaintiff would not be part of the nursing cohort.

120.    They emphasized these were the only available options, regardless of any attempts Plaintiff might make to contact various departments within the nursing program.

121.    Second Final Exam (August 18, 2023): With no viable alternatives, Plaintiff agreed to retake the final exam.

122.    During discussion with administration, Plaintiff requested clarification on the exam format. Defendant Ruzovich agreed that the exam would be a cumulative-style exam with questions similar to the original exam, following the same blueprint/rubric as Summer 2023.

123.    On August 17, 2023, Plaintiff met with Defendant Ruzovich for a review session. Defendant Ruzovich shared her screen showing the Summer 2023 blueprint and advised Plaintiff to follow it because certain sections were worth more points.

124.    Plaintiff reviewed the blueprint section by section, with Defendant Ruzovich directing him to study accordingly.

125.    When Plaintiff took the second final exam on August 18, it immediately became apparent that the agreement had not been honored. The exam deviated significantly from what had been discussed, using a different and more complicated format from the initial exam.

126.    Instead of following the Summer 2023 blueprint as promised, the exam administered was from Spring 2023 with a substantially different content distribution.

127.    The math portion increased from three questions in the first exam to eight questions in the second. Similarly, the elimination section decreased from 6-7 questions to only 1-2 questions.

128.    The second exam also introduced a new question format requiring Plaintiff to "select all that apply" instead of "select two that apply," a format that had never been used in any Summer 2023 exams.

129.    This change was particularly significant because it did not align with the Next Generation NCLEX polytomous scoring method adopted and implemented by the school during the summer semester 2023, and it was addressed in the Initial welcoming PowerPoint during the Summer semester 2023

130.    On the Final Second Exam of the First semester in summer 2023, Plaintiff received a 68.8% with NO partial credit awarded for "select all" questions.

131.    For the first time in the semester, the school provided all required accommodations for this exam, including multiple sheets of scratch paper, a calculator, and functioning text-to-speech technology.

132.    Without making any adjustments to Plaintiff's computer, they somehow managed to fix the technology issues that had blocked Plaintiff from using his text-to-speech accommodation and the highlighting function during the previous exams.

133.    However, the exam was conducted with excessive security measures. Before beginning, instructors patted Plaintiff down, scrutinized his backpack contents, and locked it away.

134.    Each restroom break required another round of pat-downs, shoe removals, and Defendant Ruzovich followed Plaintiff into the bathroom for inspections—measures not applied to his non-disabled peers.

135.    Plaintiff  scored 68.5% on the second final exam. When Plaintiff asked if the grade would be rounded based on school practice, the instructors were emphatic that it would not.

136.    This was concerning because Plaintiff later learned that students who took this same Spring 2023 final exam previously had their grades rounded up by over 6% due to discrepancies in the exam.

137.    Dr. Miller, a high-ranking administrator in the nursing program, acknowledged that the exam was sourced from Spring 2023 but did not dispute that grades had been rounded up significantly for previous students.

138.    On August 21, 2023, the Fall semester began, and Plaintiff commenced his studies at the University of Arizona College of Nursing.

139.    From the outset, Plaintiff experienced changes in faculty attitudes, with some faculty becoming even less accommodating and more critical of his performance due to his disability status.

140.    On September 5, 2023, during Exam 1 for the Fundamentals of Nursing course, Plaintiff was subjected to excessive scrutiny by Defendant Rozavitch and Dr. Diamond.

141.    These instructors forced Plaintiff to lock up all personal belongings and closely monitored him throughout the exam, frequently checking his progress and making notes on his behavior. This treatment, not applied to his non-disabled peers and created a hostile testing environment.

142.    On October 3, 2023, during Exam 2, the discriminatory scrutiny continued. The professors again singled out Plaintiff, closely monitored him, and expressed skepticism about the necessity of his accommodations.

143.    This surveillance significantly disrupted his ability to focus and maintain composure.

144.   On November 7, 2023, during Exam 3, the pattern of discriminatory treatment intensified.

145.   Plaintiff felt the weight of their judgment and skepticism towards his disability-related accommodations, further demoralizing him.

146.   Throughout the Fall 2023 semester, Plaintiff experienced systematic discrimination. For the first three exams, Defendant Rozavitch and Dr. Diamond provided exam summaries documenting the accommodations provided.

147.   However, this communication abruptly ceased for the final exam, with no communication received from Defendants Parisek and Rozavitch, or Dr. Diamond.

148.   Despite these challenges, Plaintiff earned a B in the Fundamentals of Nursing course, demonstrating his academic capabilities even in the face of discrimination and retaliation.

149.   In January 2024, as Plaintiff began the NURS 381 course, Defendant Parisek demanded additional documentation to justify his need for extended time on clinical skills assessments, despite these accommodations having been previously approved by the DRC.

150.   This administrative burden significantly detracted from his studies and heightened his stress.

151.   Notably, this escalation in scrutiny occurred shortly after Plaintiff filed his first OCR complaint against the University of Arizona, College of Nursing on November 30, 2023.

152. On the first day of class, after arriving a few minutes late due to a necessary Zoom call with his DRC counselor regarding accommodations, Plaintiff was immediately issued a warning for tardiness by Dr. Leverenz.

153. Later that week, despite being in the building and merely stepping out to use the restroom (a documented accommodation for his bladder condition), Plaintiff received a second warning and was made to leave class—a punitive response not directed at his peers for similar behaviors.

154. On March 13, 2024, during a clinical rotation at Banner Desert Hospital, Plaintiff experienced severe discriminatory treatment orchestrated by Dr. Kim Licciardi.

155. At approximately 10:30 AM, in full view of peers and hospital staff, Dr. Licciardi unexpectedly demanded that Plaintiff provide SBAR (Situation, Background, Assessment, Recommendation) reports on patients not yet assigned to him.

156. When Plaintiff explained that he had not been designated those patients, she berated him for requesting his approved accommodations—specifically the use of his iPad for patient documentation and medical referencing.

157. This public confrontation lasted nearly 30 minutes and significantly impaired his focus and performance.

158. During subsequent clinical experiences, Dr. Licciardi aggressively interrogated Plaintiff regarding detailed disease processes and medication interactions without permitting access to his approved accommodations or the reference materials available to his peers.

159. For example, when Plaintiff attempted to answer questions related to a laparoscopic appendectomy and define medications such as Ancef, he was subjected to rapid-fire questioning and harsh criticism despite not being assigned those patients.

160. Plaintiff was pressed to describe mechanisms of action for various drugs and to identify appropriate medications for fever and pain, all without the benefit of his approved accommodations that would have allowed him to look up this information, as he would do in actual clinical practice to ensure patient safety.

161. These practices significantly hindered Plaintiff's ability to demonstrate sound clinical judgment, articulate complex medication interactions, and effectively retrieve essential clinical information.

162. The lack of necessary tools, such as a functional iPad, dictation/text-to-speech software, and the capacity for quick online searches via Google, created an unfair and high-pressure environment that did not accurately reflect Plaintiff's true knowledge or clinical abilities.

163. Furthermore, Plaintiff's prohibition from utilizing his approved accommodations, including the ability to search for pertinent information online, constitutes direct discrimination.

164. The Evaluator's refusal to allow access to these critical reference tools not only impeded Plaintiff's performance but also led to assessments that were grossly inconsistent with those of his peers.

165. The evaluation document stated that Plaintiff could not use Google while in nursing school.

166. Dr. Licciardi falsely claimed Plaintiff was "unable to describe the most important surgical assessments" for a post-operative patient.

167. In fact, Plaintiff had accurately identified the key assessments: examining surgical incision sites for signs of infection, monitoring pain levels, evaluating bowel function, checking vital signs, and assessing overall comfort and hydration status.

168. While Plaintiff acknowledges misstating the exact duration for listening to bowel sounds by one minute, the assertion that he confused the order of the abdominal assessment was inaccurate.

169. On March 19, 2024, following these biased evaluations, Dr. Licciardi and Defendant Parisek falsely labeled Plaintiff a "SAFETY CONCERN" in his evaluation, despite his consistent A's and B's across all courses including simulations.

170. This damning characterization starkly contradicted Plaintiff's documented academic success and was designed to create a pretext for removing him from the nursing program.

171. Plaintiff was not provided with the dictation tool (Dragon), Orcam software/project, or other accommodations he had repeatedly requested through the DRC.

172. When Plaintiff offered to use his phone as an alternative means of accessing dictation and conducting searches as he had observed many nurses do for quick calculations and references, he was denied this option.

173.   The school's rigid policy against phone usage during clinicals, without considering the already approved accommodations by a student with disabilities, further demonstrates the discriminatory nature of the clinical evaluation process.

174.   On March 16, 2024, Plaintiff received an email from Defendant Parisek, Professor Leverenz, and Dr. Licciardi requesting an "urgent" in-person meeting to discuss his clinical progress.

175.   Feeling apprehensive due to recent discrimination, Plaintiff politely requested a Zoom meeting instead at 4:15 PM.

176.   At 5:00 PM, Defendant Parisek sent a curt reply dismissing Plaintiff's request and insisting on an in-person meeting with no option for negotiation.

177.   On March 19, 2024, in a Zoom meeting with Defendant Parisek, Professor Leverenz, Dr. Licciardi, and two other faculty members, Plaintiff was informed he had been evaluated without his approved accommodations by Dr. Licciardi.

178.   Defendant Parisek labeled his performance "subpar" and stated Plaintiff would face expulsion without significant improvement in the next three clinical sessions.

179.   Dr. Licciardi made several false accusations during this meeting, claiming Plaintiff broke HIPAA regulations by including a Medical Record Number in his documentation when in fact, this was a generated fake number from the ATI EHR system used for practice.

180.   Dr. Licciardi further claimed Plaintiff lacked competence in using internet resources, describing diagnoses, identifying medications, describing the mechanism of

action of medications, identifying surgical assessments, and formulating care plans—all without acknowledging that Plaintiff was denied access to his approved accommodations during evaluation.

181.    When Plaintiff attempted to defend himself by explaining the impact of not having his accommodations, Defendant Parisek interjected stating that these issues were "well-documented" and his explanations were "irrelevant."

182.    The evaluation document emerging from this meeting alarmingly declared Plaintiff a **"SAFETY CONCERN"** despite his consistent A's and B's across all courses including simulations.

183.    This stark contradiction between Plaintiff's documented academic success and the evaluation's damning content established administration's wrongful motives, particularly given its timing after Plaintiff's OCR complaint.

184.    The evaluation claimed Plaintiff couldn't identify medications like Tylenol and Motrin, couldn't describe mechanisms of action, and couldn't perform basic assessments, all of which were either false or misrepresented his actual responses given under pressure without accommodations.

185.    Each criticism was directly contradicted by Plaintiff's strong academic performance in classroom settings when adequately accommodated.

186.    When confronted about conducting evaluations without approved accommodations, Defendant Parisek deflected responsibility, falsely claiming it was solely the DRC's responsibility to implement accommodations, a misrepresentation of

her duties as Director of the Nursing Program, who was specifically responsible for ensuring clinical accommodations were in place.

187.   On March 20, 2024, Defendant Parisek orchestrated a deceptive scenario by reaching out to Plaintiff and Professor Jeremy Sukkahs, falsely claiming that Professor Sukkahs had initiated an urgent meeting to discuss Plaintiff's first med-surg clinical performance.

188.   In reality, Professor Sukkahs was uninformed about the meeting until the day it occurred and was guided by Defendant Parisek on what to say during the meeting.

189.   This fabricated emergency meeting directly contradicted Professor Sukkahs' commendation of Plaintiff's performance earlier that day, when he had praised Plaintiff's SBAR as excellent.

190.   Despite his positive initial interaction with Plaintiff, Professor Sukkahs was coerced into participating in a reevaluation meeting he had not initiated.

191.   On March 21, 2024, after extensive self-advocacy and having to personally contact the hospital technology department (despite being told not to do so by Dr. Licciardi), Plaintiff finally received HIPAA-compliant applications for his iPad that were essential for clinical documentation.

192.   This came after Defendant Parisek had repeatedly failed to liaise with hospitals to secure these tools despite assurances she would do so.

193.   Dr. Licciardi had explicitly instructed Plaintiff not to contact the hospital's technology department, claiming this was Defendant Parisek's responsibility.

194.    This pattern of non-responsiveness not only hindered Plaintiff's academic capabilities but also signaled an apparent agenda to systematically block his success.

195.    On March 22, 2024, as part of a discriminatory evaluation process, Plaintiff was subjected to an additional pediatric clinical experience—an extraordinary third rotation specifically arranged by Defendant Parisek, Dr. Licciardi, and Dr. Leverenz to reassess Plaintiff's clinical competencies after labeling him a safety risk—an extra burden not imposed on any other student.

196.    This requirement, purportedly designed to "ensure faculty evaluation in the pediatric setting with Plaintiff's accommodations in place," tacitly acknowledged that previous evaluations had been conducted under unfair conditions without the proper accommodations, thereby underscoring the discriminatory nature of Dr. Licciardi's practices and the nursing program's failure to provide the required supports despite claims of Plaintiff's supposed deficiencies.

197.    During this clinical, Plaintiff was initially forced to present an SBAR on a patient he had not chosen and had limited interactions with due to parental restrictions.

198.    Recognizing the unfairness, Plaintiff asserted his rights by citing the nursing rubric that allows students to select their own patients for presentations. Plaintiff subsequently presented an SBAR on his chosen patient with marked proficiency.

199.    Despite the intense scrutiny during this third clinical, Dr. Leverenz acknowledged Plaintiff's competence, which starkly contrasted with the earlier evaluation.

200.    At the conclusion of this intense session, as Dr. Leverenz and Professor Allen were leaving, Dr. Leverenz remarked, "You'll make a great pediatric nurse"—a significant acknowledgment of Plaintiff's capabilities that directly contradicted the "SAFETY CONCERN" label.

201.    On March 27, 2024, Plaintiff attended a mandatory Zoom meeting with Defendant Parisek and Professor Sukkahs. During this meeting, scheduled for 60 minutes but lasting only 30, Defendant Parisek conveyed that Plaintiff's performance was deemed unsatisfactory across all areas of clinical practice in Med-Surg.

202.    When Plaintiff questioned how he could obtain all A's in simulations but supposedly know "absolutely nothing" in clinical settings, Plaintiff was told that despite receiving A's and B's in all courses, he could still be removed from the nursing program based on clinical evaluations.

179.    Defendant Parisek dominated the call, listing perceived deficiencies and refusing to allow Plaintiff or his advocate to respond or ask questions.

180.    On March 29, 2024, during his second MedSurg clinical, Plaintiff confronted Professor Sukkahs about the contradictions between his initial positive feedback ("good job") during the first MedSurg clinical and the concerns raised in the meeting.

181.    Professor Sukkahs apologized to Plaintiff, acknowledging he felt uncomfortable having been told what to say by Dr. Parisek in the Zoom meeting that he

did not initiate. He decided to evaluate Plaintiff himself rather than rely on Dr. Parisek's characterization.

182.   Professor Sukkahs had warned Plaintiff that Dr. Leverenz would be coming to his last MedSurg clinical to test his skills, saying he was "trying to hold her off" so he could work with Plaintiff directly. Despite this warning, Dr. Leverenz never appeared at the final MedSurg shift.

183.   On April 25, 2024, in a conversation with his DRC coordinator Spencer, Plaintiff learned a crucial fact: clinical evaluations are never conducted or graded in the clinical setting, nor are they factored into official academic records.

184.   This was confirmed when Spencer spoke with Mr. Thomas, a Level III professor, who affirmed that clinical evaluations do not impact students' official records.

185.   This revelation confirmed Plaintiff's suspicions that these extraordinary evaluations and meetings were tools for harassment and discrimination, specifically designed to undermine his progress and justify his eventual expulsion from the nursing program in retaliation for his November 30, 2023 OCR complaint.

186.   The timing and escalating nature of these actions—beginning shortly after Plaintiff's OCR complaint filing and continuing with increasing severity throughout the Spring 2024 semester—demonstrate a clear pattern of retaliation prohibited under federal disability laws, particularly Section 504 of the Rehabilitation Act and the Americans with Disabilities Act.

187.   During Summer 2024, evidence indicated that NURS 450 examinations, administered during a challenging 13-week Summer semester, were subject to deliberate manipulation.

188.   Plaintiff was administered exams of greater difficulty relative to those provided to peers, with the institution justifying such measures under the guise of "academic integrity" despite no substantiated misconduct.

189.   Moreover, the Plaintiff underwent differential accommodations—taking some examinations on alternate days while others were conducted concurrently with or immediately following those of peers, which afforded the institution sufficient latitude to modify or substitute exam content.

190.   In Exams 1 through 3 of NURS 450, Plaintiff's scores were consistently reduced by approximately five points per examination, whereas peers received upward score adjustments, thereby establishing a systematic pattern of point withholding.

191.   Prior to the final examination, Plaintiff was informed that a passing grade required a minimum of 68%, as opposed to a 65% requirement for his peers, thereby creating an artificial barrier.

192.   Subsequent to the final exam—on which Plaintiff achieved exactly 68%—retroactive point adjustments were applied to earlier examinations, revealing that the effective passing threshold was, in fact, 64%.

193.   Multiple mediation sessions were conducted during the semester, during which Plaintiff reiterated concerns of sustained discrimination and retaliation. These

proceedings underscored that the manipulated grading practices were not isolated incidents but part of a broader pattern of inequitable and discriminatory academic treatment.

194.   Plaintiff signed up for multiple nursing proctorship on the night it opened, OCR mediator Andreas Ramirez noted that Connie Miller claimed during an second OCR civil rights meeting that Plaintiff never applied, revealing how the University of Arizona College of Nursing manipulated the situation to block Plaintiff proctorship to maintain control by assigning their own faculty as preceptors to Plaintiff.

195.   August 23, 2024: Plaintiff ranked his top choices for preceptorship placement, selecting ICU/CVICU as his first preference, demonstrating his commitment to challenging clinical experiences that would best prepare him for his nursing career.

196.   August 30-31, 2024: Plaintiff encountered issues with his HonorHealth badge and technical access to the Epic system. Plaintiff proactively contacted Dr. Lemke about these issues, writing: "I can't access the MAR. I've noticed I'm blocked from a lot of patient charting and other features." This further demonstrated Plaintiff's diligence in addressing potential barriers to his clinical performance.

197.   September 14 and 21, 2024: Plaintiff received feedback on his goal sheets where preceptors note he needs to continue improving medication knowledge/assessments and should look up medications prior to administration. Despite these suggestions for improvement, Plaintiff's preceptors also note positive aspects of his performance, including his willingness to ask questions and patient education skills.

198.  September 27, 2024: Dr. Lemke posts grades for goal sheets 3 and 4, expressing concerns about Plaintiff's medication preparation despite positive feedback from preceptors about his patient education and medication knowledge. Plaintiff responded with a detailed explanation addressing each concern and expressing confusion about the discrepancy between the preceptor's feedback and faculty interpretation.

199.  September 28, 2024: Professors Vezzosi and Lemke reported observing a medication pass with Plaintiff, noting concerns about chart navigation and patient communication, despite Plaintiffs explanation that he was using adaptive strategies due to his dyslexia. The observation lasted only minutes, yet conclusions were drawn about Plaintiff's competence that contradicted the assessments of his preceptors who spent entire clinical shifts with Plaintiff.

200.  September 30, 2024: Dr. Lemke emailed Plaintiff a midterm evaluation outlining concerns and announcing an action plan for Plaintiff's next shift on October 5. The email cites concerns from "different preceptors and faculty" despite multiple preceptor evaluations documenting Plaintiff's competence.

201.  October 3, 2024: Plaintiff sent a detailed 57-page response to Dr. Lemke, thoroughly addressing each concern and explaining his dyslexia's impact on his learning process. Plaintiff detailed his extensive training through the Barton Reading & Spelling System and the Orton-Gillingham method, explaining how he breaks down complex medical terminology into components as part of his accommodation strategy.

202.   October 3-4, 2024: Professor Vezzosi claimed preceptor Whitney Philippe raised "safety concerns" regarding a document alteration changing "perform" to "performed" in a clinical evaluation.

203.   Vezzosi fabricated an example about oxygen rates that Philippe later explicitly denied. This fabrication became a critical element in Vezzosi's case against Plaintiff, despite having no basis in fact.

204.   October 4, 2024: Vezzosi emailed Plaintiff with vague allegations without specifying the actual concern, for allegedly violating Policy 5-403.C.4's requirement for "an explanation of the charges." The email merely states that he has "concerns about the integrity of the submitted document" without detailing the specific issue or providing evidence.

205.   October 5, 2024: Text messages between Plaintiff and his mother show they believed faculties concerns centered on legibility improvements and that Plaintiff's mother instructed him to tell Whitney he "was just trying to make it neater and more legible." These messages provide conclusive evidence that Plaintiff was unaware of any substantive change to the document and was focused solely on the belief that there were legibility concerns.

206.   On October 6-7, 2024, Plaintiff explicitly requested that his DRC counselor Spencer Lambert, be present during any meetings, writing: "I am available to meet on Monday, October 7, from 2:00 PM to 3:00 PM, as long as Spencer is available to attend."

207.  On October 8, 2024, Defendants initially tried to proceed with the meeting without Spencer, directly denying Plaintiff's accommodation rights during a disciplinary proceeding. During the October 8 meeting it became clear that Plaintiff's mother had made the document change for legibility reasons without Plaintiff's knowledge, as part of an authorized accommodation assistance for his dysgraphia.

208.  Plaintiff had a call with his DRC counselor and only then became aware of the specific "ED" modification to the word "perform." Plaintiff 's mother admitted, "I added the 'ED' in a different color because "she thought it made more sense". Plaintiff's mother stated that she wasn't thinking that deeply about the minor change because to Professor Limke had Plaintiff's actual clinical evaluation 3 days prior, Plaintiff's mother stated it was late and she "wanted it to look neat."

209.  On October 21, 2024, Professor Vezzosi praises Plaintiff's professionalism and wrote, "I really enjoyed reading your leadership paper... You are a strong writer and provided a great analysis of your experiences in nursing school. I have no doubt you will be an amazing nurse!" This demonstrated the abrupt and inexplicable shift in faculty attitude that would occurred within 24 hours.

210.  On October 22, 2024, Plaintiff received an email detailing severe sanctions including a failing grade and an interim suspension effective immediately.

211.  This immediate interim suspension occurred less than two months before Plaintiff's anticipated December graduation.

212.    On October 23, 2024, Plaintiff, unaware of the suspension, arrived on campus as usual. Instead of being pulled aside privately, Defendant Parisek advised Plaintiff of the suspension publicly in the main hallway and had two security guards escort Plaintiff off campus in full view of all students, ensuring that the disciplinary action was overt and humiliating.

213.    The public removal left Plaintiff visibly agitated and upset as he was escorted out by two security guards. In his heightened state of distress, Plaintiff began grinding his teeth, which resulted in chipping them, a stark physical manifestation of his emotional and psychological anguish.

214.    On October 29, 2024, Defendant Senior Vice Provost Gail Burd rescinded the suspension after 7 critical days of missed course work and instruction.  Ms. Burd wrote "While the information supporting the allegations of academic misconduct are reliable in this situation, the College of Nursing's October 22, 2024 letter notifying you of your interim suspension under Section IV of the CAI does not state that, or provide any information to support that, you pose a significant threat to any person or property. I am not aware of any information indicating that your continued presence poses a significant threat."

215.    This revocation of the interim suspension was prompted by Plaintiff's attorney's involvement and action. Without that the suspension, discrimination and retaliation would have continued.

216. Defendant Burd's message further stated that the rescission "does not impact the College of Nursing's determination regarding a violation of the CAI or the sanctions issued for that violation." This meant that Plaintiff faced the daunting task of catching up on a week's worth of missed lectures, clinical experiences, assignments, and exam preparation. During that week university faculty informed Plaintiff's fellow nursing classmates that he would not be returning to school at all.

217. Plaintiff's fellow students were told this after some of them witnessed Plaintiff being escorted off the campus by two security guards.

218. On October 30, 2024, Defendant Parisek falsely stated that Plaintiff had "uninterrupted access to his courses during his 7 day suspension through D2L" but offered woefully inadequate accommodations for Plaintiff's mountain of missed work. Plaintiff objected being required to take a high-stakes exam immediately following his "unethical 7-day suspension" and requested an alternative assessment format.

219. This was refused. Despite just returning from an improper 7 day suspension, Plaintiff was expected to immediately take exams he had no meaningful opportunity to prepare for, creating an impossible academic situation.

220. Preceptor Philippe's statement directly contradicted the allegations, confirming "the change to 'performed' did not have any notable impact" and "I have no concerns about safety." Philippe's explicitly stated, "I have worked with the student previously and have consistently seen appropriate safety checks performed." This critical

exculpatory evidence directly refuted the foundation of the academic misconduct charges.

221.  On November 5, 2024, Plaintiff submitted a 61-page appeal addressing the alleged violations of academic integrity, wrongful sanctions, and the institution's procedural violations. The appeal systematically dismantled the allegations and documented the numerous procedural irregularities throughout the process.

222.  On November 6-7, 2024, Plaintiff sent an extensive email to Spencer Lambert requesting accommodation for the NURS 473 Exam #2 and detailing the academic and psychological impact of the misconduct proceedings.

223.  Plaintiff sent multiple urgent emails to Spencer Lambert starting at 6:29 AM, and asking about the status of his accommodations for the exam scheduled at 8:00 AM. By 8:30 AM on November 7, having received no accommodation support, Plaintiff was forced to take the exam under standard conditions despite missing critical instruction during his 7 day wrongful suspension.

224.  Throughout November 2024, Plaintiff faced the extraordinary challenge of completing make-up clinical rotations with limited flexibility from preceptors, preparing for and taking multiple exams with minimal study time (including ATI standardized assessments that impact graduation eligibility), catching up on two weeks of assignments across three demanding nursing courses, completing group projects where his forced absence affected team dynamics and created additional interpersonal challenges, and managing clinical make-up requirements with external stakeholders who had limited

availability all while preparing his academic integrity appeal and managing the psychological trauma of the ongoing disciplinary process.

225.   On November 20, 2024, Plaintiff took the ATI proctored Leadership Assessment with minimal preparation time. Around this same time Plaintiff was notified about a meeting with Dean Ahn regarding his appeal.

226.   On November 20-22, 2024, Defendant Dean Hyochol Brian Ahn met with Plaintiff concerning his appeal. Throughout the meeting, Plaintiff provided additional evidence of his lack of awareness of the changes to the document and explains how the assistance from his mother was part of his documented accommodations for dysgraphia.

227.   On November 27, 2024, Plaintiff took the NURS 479 comprehensive predictor exam, a high-stakes assessment that impacts his ability to graduate, while still managing the overwhelming backlog of coursework and the stress of the pending academic misconduct decision.

228.   On December 2, 2024, Defendant Ahn issued a modified sanctions determination including a Written Warning and mandatory Academic Integrity Workshop while acknowledging there was "insufficient evidence to conclude that Plaintiff was aware" of the change.

229.   Defendant Ahn's decision created an irreconcilable logical contradiction—acknowledging a lack of evidence while still imposing punitive measures.

230.   Dr. Ahn's decision allowing Plaintiff to graduate came as Plaintiff was preparing for final exams and completing graduation requirements.

231.   On December 6, 2024, Plaintiff submitted a request for Provost-level review under ABOR Policy 5-403(G), arguing that while Dr. Ahn's modified sanctions did not trigger an automatic University Hearing Board appeal, the procedural violations and disability discrimination warrant review.

232.   On December 11, 2024, Plaintiff faced the tremendous pressure of completing Exam #3 and his ATI cumulative exam, while still managing the ongoing stress of the academic integrity proceedings and attempting to complete his capstone project.

233.   On December 13, 2024, Defendant Marx denies the request for review, stating: "Provost Review under the University Disciplinary Procedures is limited to disciplinary matters... where there has been University Hearing Board ('UHB') hearing and recommendation... "As you know, in Mr. Goldman's case, there was no UHB hearing or a decision by the Provost and, therefore, Mr. Goldman cannot request Provost Review under 5-403(G)." This decision effectively closes all administrative remedies despite the well-documented due process violations.

234.   On December 17, 2024, Despite being indigent and facing significant financial hardship, Plaintiff is forced to pay the $70 fee for the Academic Integrity Workshop, creating additional financial stress during graduation.

235.   Plaintiff completes the Academic Integrity Workshop despite the overwhelming end-of-semester workload and graduation preparations. Just hours before his graduation ceremony in Gilbert, university administrators email Plaintiff in what

appears to be a last-minute attempt to verify workshop completion and prevent his participation in the ceremony. The timing of this verification, coming just before the graduation event, creates unnecessary stress during what should be a celebratory moment and appears designed to create maximum pressure and anxiety.

236.   On December 19, 2024, Despite all these extraordinary challenges, Plaintiff successfully completes all graduation requirements and graduates with his nursing degree, demonstrating remarkable resilience and dedication to his profession in the face of systematic barriers.

237.   The improper sanctions against Plaintiff created lasting consequences with discriminatory impact. The institution's improper sanctions has affected Plaintiff's graduate school applications, including to the U of A's MSN program with January 15, 2025 deadlines.

238.   The $70 workshop fee imposed a financial burden on an already indigent student with limited resources.

239.   The precedent created by Defendants discourages accommodation use, violating the University's stated commitment to inclusivity.

240.   The academic integrity violation remains on Plaintiff's record for five years, impacting Plaintiff's job prospects and graduate school opportunities and create a form of defamation impacting his professional advancement and graduate school opportunities.

241.    The record creates an ongoing barrier for a first-generation student from a historically marginalized community who has worked extraordinarily hard to overcome systemic educational obstacles.

**<u>First Claim for Relief</u>**
**(Violation of Title II of the Americans with Disabilities Act, 42 U.S.C.**

**§ 12131-12134)**

233.    Plaintiff incorporates all of the above paragraphs as though fully stated herein.

234.    Under federal law, Title II of the Americans with Disabilities Act prohibits public entities from discriminating against qualified individuals with disabilities in their services, programs, or activities.

235.    Defendant University of Arizona (through the Arizona Board of Regents) is a public entity subject to Title II of the ADA, 42 U.S.C. § 12131(1).

236.    Plaintiff is a qualified individual with disabilities (including dyslexia, dysgraphia, ADHD, and autism spectrum disorder) who, with reasonable accommodations, meets the essential eligibility requirements for participation in the University's nursing program.

237.    Plaintiff required reasonable accommodations (including extended testing time of 2.25x, distraction-reduced environment, text-to-speech software, multiple sheets of scratch paper, and calculator use) to have equal access to the nursing program's

examinations and coursework. These accommodations were approved by the University's

Disability Resource Center.

238.    Defendant University failed to ensure these accommodations were properly

provided and instead discriminated against Plaintiff because of his disabilities. Such

discriminatory conduct included:

o    Subjecting Plaintiff to excessive surveillance during exams

o    Denying adequate scratch paper and calculator access on exams

o    Refusing to pause exams when accommodations malfunctioned

o    Requiring Plaintiff to meet a higher passing threshold (68%) than his peers

(65%)

o    Denying grade adjustments routinely granted to other students

o    Ultimately excluding Plaintiff from the program through academic

dismissal

239.    Defendant's conduct was intentional and/or carried out with deliberate

indifference to Plaintiff's federally protected rights. As a direct result of these ADA

violations, Plaintiff suffered educational setbacks, severe emotional distress, damage to

his reputation, and financial losses.

240.    Defendants' acts and omissions described herein caused Plaintiff's damages

which will be established at trial.

**<u>Second Claim for Relief</u>**
**(Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794)**

241.    Plaintiff incorporates all of the above paragraphs as though fully stated herein.

242.    Under federal law, Section 504 of the Rehabilitation Act prohibits discrimination against otherwise qualified individuals with disabilities in any program or activity receiving federal financial assistance.

243.    Defendant University of Arizona receives federal financial assistance for its educational programs, including the College of Nursing, and is therefore subject to the requirements of Section 504 of the Rehabilitation Act.

244.    Plaintiff is an "otherwise qualified individual with a disability" under Section 504, meaning he was qualified to participate in the nursing program and could meet its academic and technical standards when provided reasonable accommodations for his disabilities.

245.    Defendant violated Section 504 by excluding and discriminating against Plaintiff solely because of his disabilities. This discrimination included:

○    Failing to ensure his approved accommodations were effectively implemented

○    Subjecting Plaintiff to requirements and penalties not applied to non-disabled students

○    Creating a hostile environment that interfered with Plaintiff's ability to access the program

o    Engineering Plaintiff's academic failure through non-compliance with accommodations and disparate standards

246.    As a direct result of Defendant's Section 504 violations, Plaintiff was denied meaningful access to educational opportunities. He suffered substantial harm, including loss of educational progress, derailment of career plans, emotional anguish, and financial losses.

247.    Defendant's conduct was willful and intentional, exhibiting deliberate indifference to Plaintiff's federally protected rights despite knowledge of his accommodation needs.

248.    Defendants' acts and omissions described herein caused Plaintiff's damages which will be established at trial.

### Third Claim for Relief
### (Unlawful Retaliation in Violation of the ADA and Rehabilitation Act, 42 U.S.C. § 12203)

249.    Plaintiff incorporates all of the above paragraphs as though fully stated herein.

250.    Under federal law, both Title II of the ADA and Section 504 of the Rehabilitation Act prohibit retaliation against individuals for exercising rights protected by those statutes.

251.    Plaintiff engaged in protected activities by:

o    Requesting reasonable accommodations

○    Complaining verbally and in writing about inadequate implementation of accommodations

○    Filing a formal complaint with the U.S. Department of Education's Office for Civil Rights on November 30, 2023

252.    Defendants were aware of Plaintiff's protected activities, and in direct response, took adverse actions against him, including:

○    Demanding additional medical documentation to "re-justify" accommodations in January 2024

○    Intensifying scrutiny through frequent unnecessary evaluations and meetings

○    Manipulating testing conditions and evaluation metrics

○    Making false accusations of academic misconduct

○    Eventually removing Plaintiff from the nursing program

253.    The timing and pattern of these adverse actions reveal retaliatory intent. Each protected activity by Plaintiff was followed by escalating negative treatment.

254.    As a direct result of Defendants' retaliation, Plaintiff suffered significant damages, including loss of educational opportunity, emotional distress, and financial losses.

255.    Defendants' acts and omissions described herein caused Plaintiff's damages which will be established at trial.

**Fourth Claim for Relief**
**(Hostile Educational Environment in Violation of ADA Title II and Section 504)**

256.    Plaintiff incorporates all of the above paragraphs as though fully stated herein.

257.    Under federal law, Title II of the ADA and Section 504 prohibit not only outright exclusion but also a hostile environment that effectively denies equal access to an educational program because of disability-based harassment.

258.    From the beginning of his enrollment, Plaintiff was subjected to ongoing harassment directly related to his disability and use of accommodations. This harassment included:

○    Excessive scrutiny during examinations

○    Openly expressed skepticism about accommodation needs

○    Disruption of testing environments

○    Differential treatment and isolation from peers

○    Condescending attitudes and dismissive responses to questions

259.    This harassment was sufficiently severe and pervasive that it effectively denied Plaintiff equal access to the University's program. By Spring and Summer 2024, the environment had become so poisoned that Plaintiff could not overcome the cumulative disadvantage imposed on him.

260.    Defendant University either intentionally created this hostile environment or allowed it to persist with deliberate indifference to its impact on Plaintiff.

261.    Due to this hostile environment, Plaintiff suffered damages including emotional distress, tangible academic harm, and additional expenses as he sought alternative paths to achieve his career goals.

262.    Defendants' acts and omissions described herein caused Plaintiff's damages which will be established at trial.

**Fifth Claim for Relief**
**(Denial of Procedural Due Process - Fourteenth Amendment, 42 U.S.C. § 1983)**

263.    Plaintiff incorporates all of the above paragraphs as though fully stated herein.

264.    Under federal law, the Fourteenth Amendment guarantees that no state shall deprive any person of life, liberty, or property without due process of law.

265.    At all relevant times, Defendants were state actors acting under color of state law, as officials of a public university.

266.    Plaintiff had significant property and liberty interests at stake in his continued enrollment in the nursing program. He entered into a contractual relationship with the University upon enrollment, paying tuition and fees in exchange for educational opportunities and a degree.

267.    Defendants deprived Plaintiff of these protected interests without providing fundamental procedural safeguards, including:

○    Failing to provide clear advance notice of intent to terminate enrollment

○    Not disclosing the elevated standards applied specifically to Plaintiff

o       Denying Plaintiff any meaningful opportunity to challenge the criteria applied to him

o       Preventing Plaintiff from appealing or contesting the decision through effective procedures

268.    The true reasons for Plaintiff's dismissal were rooted in discrimination and retaliation, not legitimate academic failure, making the process fundamentally unfair.

269.    As a result of these due process violations, Plaintiff suffered deprivation of his property and liberty interests, lost his education and degree, wasted time and money, and carries the stigma of an unexplained expulsion.

270.    Defendants' acts and omissions described herein caused Plaintiff's damages which will be established at trial.

**Sixth Claim for Relief**
**(Violation of Substantive Due Process - Fourteenth Amendment, 42 U.S.C. § 1983)**

271.    Plaintiff incorporates all of the above paragraphs as though fully stated herein.

272.    Under federal law, the Fourteenth Amendment's Due Process Clause has a substantive component that protects individuals from arbitrary and egregious exercises of government power.

273.    Defendants' conduct toward Plaintiff was so arbitrary, capricious, and oppressive that it violated Plaintiff's substantive due process rights.

274.   Acting under color of state law, Defendants abused their authority by intentionally targeting Plaintiff for mistreatment unrelated to legitimate educational objectives. Their actions included:

    ○    Deliberately altering exam difficulty specifically for Plaintiff

    ○    Imposing higher academic standards not applied to other students

    ○    Systematically withholding required accommodations

    ○    Engaging in a coordinated effort to engineer Plaintiff's academic failure

275.   These actions were motivated by animosity and retaliation rather than valid pedagogical goals, constituting a gross deviation from accepted academic standards that shocks the conscience.

276.   Defendants' conduct interfered with Plaintiff's deeply important interest in pursuing his chosen profession, temporarily barring him from the nursing profession for reasons unrelated to merit.

277.   As a direct consequence, Plaintiff suffered grievous harm, including educational deprivation and significant emotional trauma.

278.   Defendants' acts and omissions described herein caused Plaintiff's damages which will be established at trial.

### Seventh Claim for Relief
### (Violation of Equal Protection - Disability Discrimination - Fourteenth Amendment, 42 U.S.C. § 1983)

279.   Plaintiff incorporates all of the above paragraphs as though fully stated herein.

280.    Under federal law, the Fourteenth Amendment's Equal Protection Clause guarantees that similarly situated persons will be treated alike by state actors.

281.    At all relevant times, Defendants were acting under color of state law as officials of a public university.

282.    Plaintiff, as a student with disabilities, was entitled to be treated the same as other students in the absence of a rational basis for differentiation.

283.    Defendants intentionally treated Plaintiff worse than similarly situated non-disabled students, as evidenced by:

○    Subjecting Plaintiff to intrusive monitoring not imposed on others

○    Denying Plaintiff standard exam aids provided to all other students

○    Requiring a higher passing threshold (68% vs. 65%) without justification

○    Denying grade adjustments routinely granted to others

○    Coordinating efforts to target Plaintiff that were not applied to any other student

284.    There was no rational basis for this disparate treatment. The methods used (extra monitoring, harder exams, higher standards) were not rationally related to legitimate educational goals.

285.    As a proximate result, Plaintiff was denied equal protection of the laws, effectively prevented from completing the nursing program due to extra requirements and obstacles others did not face.

286.    Defendants' acts and omissions described herein caused Plaintiff's damages which will be established at trial.

**Eighth Claim for Relief**
**(First Amendment Retaliation, 42 U.S.C. § 1983)**

287.    Plaintiff incorporates all of the above paragraphs as though fully stated herein.

288.    Under federal law, the First Amendment protects individuals' rights to free speech, including the right to speak out about matters of personal and public concern without fear of retaliation from government officials.

289.    Plaintiff engaged in protected speech by:

○    Complaining to instructors and administrators about unfair treatment

○    Communicating with the Disability Resource Center about accommodation issues

○    Filing a formal OCR complaint

290.    Defendants were aware of Plaintiff's protected speech, as his complaints were directed to them or their colleagues.

291.    Defendants took adverse actions against Plaintiff that would chill a person of ordinary firmness from continuing to speak out, including heightened scrutiny, false accusations, increased academic burdens, and ultimately expulsion.

292.    A causal connection exists between Plaintiff's protected speech and these adverse actions, supported by temporal proximity and evidence of retaliatory animus.

293.    As a direct result, Plaintiff suffered significant harm, including loss of education and intense emotional distress.

294.    Defendants' acts and omissions described herein caused Plaintiff's damages which will be established at trial.

## Ninth Claim for Relief
### (Violation of Right to Petition for Redress of Grievances - First Amendment, 42 U.S.C. § 1983)

295.    Plaintiff incorporates all of the above paragraphs as though fully stated herein.

296.    Under federal law, the First Amendment guarantees the right to petition the Government for redress of grievances.

297.    Plaintiff exercised this right by filing a formal complaint with the Department of Education's Office for Civil Rights on November 30, 2023, and by utilizing the University's internal grievance procedures.

298.    Defendants were aware of these petitioning activities, as evidenced by their reactions and behavioral changes after the filing.

299.    Acting under color of state law, Defendants retaliated against Plaintiff for exercising his right to petition by:

○    Imposing new administrative burdens immediately after the OCR complaint

○    Intensifying their negative campaign against Plaintiff as the OCR process continued

○    Ultimately expelling Plaintiff while the OCR investigation was still pending

300.    The causal link between Plaintiff's petition and Defendants' retaliation is direct, as shown by timing and explicit references to the OCR complaint as a source of frustration.

301.    As a result, Plaintiff suffered adverse consequences including terminated education and emotional distress. Furthermore, Defendants' retaliation effectively denied Plaintiff the benefit of his petition.

302.    Defendants' acts and omissions described herein caused Plaintiff's damages which will be established at trial.

### Tenth Claim for Relief
### (Fourteenth Amendment "Stigma-Plus" Claim - 42 U.S.C. § 1983)

303.    Plaintiff incorporates all of the above paragraphs as though fully stated herein.

304.    Under federal law, the Fourteenth Amendment's Due Process Clause protects liberty interests when the government impugns someone's reputation while also altering their legal status, giving rise to a "stigma-plus" claim.

305.    The "stigma-plus" doctrine requires: (1) a stigma to the plaintiff's reputation through public disclosure of a serious charge, and (2) an alteration or extinguishment of a right or status recognized by law.

306.    Defendants falsely labeled Plaintiff a "SAFETY CONCERN" in his clinical evaluation on March 19, 2024, despite his consistent academic success with A's and B's across all courses including simulations.

307.    This false and defamatory label was communicated to faculty members, clinical instructors, and potentially other external parties, creating a stigmatizing effect on Plaintiff's professional reputation.

308.    This stigma was combined with adverse action when Plaintiff was removed from the nursing program, constituting the "plus" factor required for this claim.

309.    The "safety risk" label harms Plaintiff's reputation and will likely be communicated to any future school or licensing board, effectively foreclosing his freedom to pursue his chosen career in nursing.

310.    When "stigma-plus" is present, due process entitles a student to a name-clearing hearing a chance to refute the charges. Defendants failed to provide any such opportunity to Plaintiff.

311.    As a result, Plaintiff has suffered reputational harm, emotional distress, and impairment of future educational and professional opportunities.

312.    Defendants' acts and omissions described herein caused Plaintiff's damages which will be established at trial.

**Eleventh Claim for Relief**
**(Breach of Contract)**

313.    Plaintiff incorporates all of the above paragraphs as though fully stated herein.

314.    Under Federal law, the relationship between a student and a university is contractual, with terms defined by university publications, policies, and specific

agreements. This includes obligations outlined in student handbooks, academic catalogs, syllabi and accommodation agreements.

315.    Plaintiff entered into a contractual relationship with the University upon enrollment, agreeing to abide by its policies and paying tuition and fees. The University, in turn committed to providing educational services and adhering to its own policies and procedures, including accommodating students with disabilities.

316.    The University breached its contractual obligations by failing to provide the accommodations explicitly agreed upon in the accommodation agreements, not adhering to policies regarding assessment formats and procedures, and altering exam formats without notice, contrary to established protocols.

317.    As a result of these breaches, Plaintiff suffered academic setbacks, financial losses due to extended program duration and emotional distress stemming from the University's failure to uphold its commitments.

318.    Defendants' acts and omissions described here in and in the earlier sections of the Complaint caused Plaintiff's damages which will be established at trial.

## Twelfth Claim for Relief
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

319.    Plaintiff incorporates all of the above paragraphs as though fully stated herein.

320.    Every contract under Federal law includes an implied covenant of good faith and fair dealing, requiring parties to act in ways that do not destroy or injure the rights of the other party to receive the benefits of the contract: "Federal law implies a covenant of

good faith and fair dealing in every contract." – *Rawlings v. Apodaca,* 151, Ariz. 149, 153, 726 P.2d 565, 569 (1986).

321.    The University's conduct, including misleading Goldman about exam formats and content, retaliating against him for asserting his rights and creating a hostile educational environment, undermined his ability to receive the benefits of the contractual relationship.  By acting in bad faith and engaging in unfair practices that harmed Plaintiff's contractual rights, the University breached the implied covenant of good faith and fair dealing inherent in their contractual relationship under Federal laws.

322.    Defendants' acts and omissions described here in and in the earlier sections of the Complaint caused Plaintiff's damages which will be established at trial.

### Thirteenth Claim for Relief
### (Negligent Misrepresentation)

323.    Plaintiff incorporates all of the above paragraphs as though fully stated herein.

324.    Under Federal law, negligent misrepresentation occurs when a party, in the course of business, supplies false information for the guidance of others in their business transactions without exercising reasonable care, resulting in pecuniary loss caused by justifiable reliance upon the information — *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307, 312, 742 P.2d 808, 813 (1987).

325.     The University provided incorrect information regarding exam formats, content coverage, and the  implementation of accommodations. This misinformation was supplied in the course of its business as an educational institution.

326.     The University did not exercise reasonable care in ensuring the accuracy of the information communicated to Plaintiff including verifying changes to exam formats or informing him in a timely manner.

327.     Plaintiff justifiably relied on the information to prepare for his examinations. The inaccuracies led to poor exam performance, academic setbacks, and financial losses associated with retaking courses or extending his program duration. The University's actions satisfy the elements of negligent misrepresentation under Federal law, making it liable for the damages incurred due to Plaintiff's reliance on false information.

328.     Defendants' acts and omissions described here in and in the earlier sections of the Complaint caused Plaintiff's damages which will be established at trial.

**Fourteenth Claim for Relief**
**(Intentional Infliction of Emotional Distress)**

329.     Plaintiff incorporates all of the above paragraphs as though fully stated herein.

330.     To establish a claim for IIED under Federal law, the plaintiff must prove:

       a.   The defendant's conduct was extreme and outrageous.

       b.   The defendant either intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result.

      c. Severe emotional distress resulted from the defendant's conduct.

— *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987)

331. The University's conduct, including publicly labeling Plaintiff a "safety concern" without justification, orchestrating meetings under false pretenses, and systematically undermining his academic success, was extreme and outrageous.

332. The University either intended to cause emotional distress or acted with reckless disregard for the high probability that its actions would result in severe emotional harm.

333. Plaintiff suffered significant emotional distress, including anxiety, depression, and feelings of humiliation, adversely affecting his academic performance and well-being.

334. The University's conduct satisfies the elements of IIED under Federal law.

335. Defendants' acts and omissions described here in and in the earlier sections of the Complaint caused Plaintiff's damages which will be established at trial.

### Fifteenth Claim of Relief
**(Defamation)**

336. Plaintiff incorporates all of the above paragraphs as though fully stated herein.

337. Under Federal law, defamation involves: 1) a false and defamatory statement concerning the Plaintiff; 2) an unprivileged publication of the statement to a third party; 3) fault amounting to at least negligence on the part of the publisher; and 4)

either actionability of the statement irrespective of special harm or the existence of special

hard caused by the publication.

*Miller v. Servicemaster by Rees*, 174 Ariz. 518, 521, 851 P.2d 143, 146 (Ct. App.

1992).

338.    The University labeled Plaintiff a "safety concern" without substantiated

evidence.    This statement is defamatory as it harms his reputation and suggests

incompetence in his chose profession.

339.    The statement was communicated to faculty members, clinical instructors,

and other students or external parties.

340.    U of A acted negligently, or with actual malice, by failing to verify the

truthfulness of the statement before disseminating it.

341.    Plaintiff suffered reputational harm, emotional distress, and impairment of

future educational and professional opportunities.

342.    The University's dissemination of false and defamatory statements

constitutes defamation under Arizona law.

343.    Defendants' acts and omissions described here in and in the earlier sections

of the Complaint caused Plaintiff's damages which will be established at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the Court to decide in his

favor and against Defendants as follows:

A.      For actual and compensatory damages sustained by Goldman in an amount to be proven at trial;

B.      For emotional distress and other reasonable damages under Goldman's IIOED Claim;

C.      For Punitive Damages;

D.      For pre- and post-judgment interest;

E.      For reasonable costs and attorneys' fees incurred; and

F.      For such other and just relief the Court deems appropriate.

DATED this 28th day of April, 2025.

**FOSTER LAW PARTNERS**

By: /s/ *Brian J. Foster*
Brian J. Foster
4402 N. 36th Street, Suite 127
Phoenix, AZ 85018
*Attorney for Plaintiff*